IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAMAR DOUGLAS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 25-CV-2905 |
| | : | |
| WELLPATH HOLDING, *et al.*, | : | |
| Defendants. | : | |

**MEMORANDUM**

**MURPHY, J.**                                                    **June 3, 2026**

*Pro se* Plaintiff Lamar Douglas, who is incarcerated at SCI Phoenix, commenced this

civil action by filing a Complaint pursuant to 42 U.S.C. § 1983, naming as Defendants: Laurel

Harry, the Secretary of the Department of Corrections ("DOC"); Corrections Health Care

Administrator Britney Huner; Nurse Supervisor Monique Savage; Wellpath, the DOC's medical

contractor; Dr. Anthony Letizio, Wellpath's Medical Director at SCI Phoenix; and individuals

identified by job title or as John/Jane Does. Currently before the Court are the Defendants'

Motions to Dismiss Mr. Douglas's Complaint, to which Mr. Douglas has responded. For the

following reasons, the Court will grant the Motions to Dismiss but give Mr. Douglas a chance to

amend.

## I.    FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY[1]

Mr. Douglas is legally blind. DI 1 at 6. At SCI Phoenix, he is classified with a "Z-

---

[1] The facts set forth in this Memorandum are taken from Mr. Douglas's Complaint. DI 1. The
Court has also considered the Exhibits to the Complaint in evaluating the sufficiency of Mr.
Douglas's pleading *see* DI 1-1; *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014)
(explaining that, in evaluating a motion under Fed. R. Civ. P. 12(b)(6), a court should consider
"the allegations contained in the complaint, exhibits attached to the complaint and matters of
public record," as well as any "document integral to or explicitly relied upon in the complaint."
(citations omitted)). We adopt the pagination assigned to all filings by the CM/ECF docketing

Code," meaning he is housed in a single cell. *Id.* According to Mr. Douglas, his Z-Code status is meant "to protect him from being harmed or attacked by other Prisoners as a result of him being unable to see," under the DOC's policy on providing accommodations for an inmate's disability. *Id.* He alleges that "[u]nder the DOC 'Z-Code' Housing Policy, any Prisoner with a Z-Code is prohibited from ever being housed with another prisoner, under any circumstances." *Id.*

Mr. Douglas also suffers from a blockage in his urethra that causes him pain when urinating. *Id.* at 5. In May 2022 he was prescribed Flomax for his condition. *Id.* Following "trips to the urologist" in 2023 and early 2024, the urologist recommended a surgical procedure to remove the blockage. *Id.* He was scheduled to have the procedure on April 14, 2024. *Id.* at 6-7, 14. On the day before his procedure, "Wellpath and the Commonwealth Defendants called [him] down to the infirmary to be housed in the infirmary over night so that the transporting officers could take [him] off-site to another medical facility" for his surgery the next day. *Id.* at 8. Mr. Douglas alleges that "[t]he Commonwealth Defendants and Wellpath required [him] to be housed [overnight] in a room with three or four other unknown prisoners," despite the fact that "[t]he infirmary contains both single rooms and single cells for Prisoners who must be isolated or who are Z-Coded." *Id.* He objected to being housed with others based on his fear of being attacked and asked to be placed in a single room or cell in the infirmary, or returned to his own single cell, "where the transporting officers could have picked him up in the morning as normally done." *Id.* at 6, 8. Following his objection, "Wellpath and the Commonwealth Defendants told [him] that Defendants would reschedule" the procedure. *Id.* at 8.

---

system. Grammar, spelling, and punctuation errors are cleaned up where necessary.

On October 14, 2024, Mr. Douglas "submitted a Request to Staff Member Slip (DC-135A) to Commonwealth Defendants CHCA Huner and Supervisor Savage," asking to be rescheduled for his treatment. *Id.* Mr. Douglas then filed a grievance on October 27, 2024, asserting that Huner and Savage did not respond to his request slip within five days, as required by DOC policy, and that Huner and Savage continued to delay the rescheduling of his surgery. *Id.* He received a denial of his grievance, which stated that his medical record contained a "DC-462 Release from Responsibility for Medical Treatment Form signed by [Mr. Douglas] stating [he] refused the outside appointment due to reasons 'I'm blind and there's four people in there, I don't feel safe.' Due to this signed refusal the consultation was not rescheduled. Should you request that you [would] like this surgical procedure rescheduled it is recommended that you meet with a provider at sick call to discuss." *Id.* at 9; DI 1-1 at 9.

Mr. Douglas appealed the grievance response, asserting that he had not refused treatment, he had merely objected to being housed with others overnight, and "if that happened, it was coerced upon [him] and [he] personally had no understanding that [he] was being denied medical treatment or refusing it." DI 1 at 9; DI 1-1 at 10. His appeal was denied by the superintendent at SCI Phoenix and then by the DOC Central Office. DI 1 at 10-11; DI 1-1 at 11-14. Mr. Douglas also filed a request with the medical records department for information on the dates of his diagnosis and prior examinations, the name of the treatments he had received and the surgical procedure that had been recommended, and "the name of the examining and prescribing medical personnel." DI 1 at 11. He appears to have only received a cursory response with the dates of his prescription for Flomax and his visits to the urologist as noted above, and he alleges that his surgery has not been rescheduled as of the filing of his Complaint. *Id.* at 11, 13.

Mr. Douglas contends that the delay in his medical treatment constitutes deliberate indifference to his medical needs in violation of his constitutional rights. *Id.* at 3, 13-14. He seeks compensatory and punitive damages in excess of $4 million, as well as an injunction directing that he be referred for his surgery and "an examination and report by an independent medical facility." *Id.* at 7, 14. After Mr. Douglas paid his filing fee in full, the Court directed service of his Complaint pursuant to a Memorandum of Understanding between the Court and the DOC. DI 8. The Defendants have filed Motions to Dismiss. DI 12, 13, 28. Mr. Douglas has responded to the Defendants' Motions.[2] DI 24, 32, 34-35. The Motions are thus fully briefed and ripe for disposition.

## II.    STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555.) "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a

---

[2] In the interim, Mr. Douglas sought preliminary injunctive relief related to his receipt of mail at SCI Phoenix, which was denied. (*See generally* DI 19, 20, 21, 23, 29, 30.

defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).  In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

To determine whether a complaint filed by a *pro* se litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed, contains facts sufficient to state a plausible claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (noting that *pro se* filings are construed liberally).

## III.    DISCUSSION

Mr. Douglas brings claims for violations of his constitutional rights based on his medical treatment.  The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  "A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) ("Each Government official, his or her title notwithstanding, is only liable for his or her *own* misconduct." (quoting *Iqbal*, 556 U.S. at 677)); *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and

5

acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)).  "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive."  *Chavarriaga v. N.J. Dept. of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995); *Rode*, 845 F.2d at 1201 n.6).  Where there are multiple events and defendants at issue, alleging personal involvement often cannot be accomplished by repeatedly and collectively referring to the "Defendants" as a group without clarifying the specific basis for each Defendant's liability. *See Lawal v. McDonald*, 546 F. App'x 107, 113 (3d Cir. 2014) (agreeing with the district court that the repeated and collective use of the word "Defendants" "fail[ed] to name which specific Defendant engaged in the specific conduct alleged'").

To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs.[3]  *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  A prison official is

---

[3]  Although Mr. Douglas also refers to the Fourteenth Amendment as a source of his claims, (*see* Compl. at 3), as a convicted and sentenced state prisoner, his claims regarding his medical treatment arise under the Eighth Amendment because the Fourteenth Amendment is only implicated in deliberate indifference claims brought by pretrial detainees, *see Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).  Like the Commonwealth Defendants, the Court assumes that Mr. Douglas's Complaint "references the Fourteenth Amendment merely as a vehicle to apply the Eighth Amendment's prohibition against cruel and unusual punishment to the Commonwealth of Pennsylvania through the Due Process Clause of the Fourteenth Amendment," because he does not plead facts to support any other claims arising under the Fourteenth Amendment.  DI 28 at 11 (citing *Robinson v. California*, 370 U.S. 660, 666 (1962).) However, given Mr. Douglas's references to the Fourteenth Amendment in his responses to the Defendants' Motions, DI 24 at 3-4; DI 34 at 9-10, to the extent that he is attempting to lodge a claim under the Fourteenth Amendment related to his medical treatment, the "more-specific-provision rule" requires litigants to pursue constitutional claims under the specific provision that covers the conduct at issue, rather than resorting to the more general Due Process Clause, so Mr. Douglas must proceed under the Eighth Amendment, *see Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 261 (3d Cir. 2010) ("Betts's claims concern his conditions of confinement and an alleged failure by Defendants to ensure his safety.  Because these allegations fit squarely within the Eighth Amendment's prohibition on cruel and unusual punishment, we hold that the more-

not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "A serious medical need is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a layperson would easily recognize the necessity for a doctor's attention." *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir. 2023) (cleaned up). "A serious medical need exists where 'failure to treat can be expected to lead to substantial and unnecessary suffering.'" *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir. 1991)).

Deliberate indifference is properly alleged "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, [or] (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Montanez v. Price*, 154 F.4th 127, 141 (3d Cir. 2025) (citation omitted), *petition for cert. filed*, 94 U.S.L.W. 3289 (U.S. Mar. 11, 2026) (No. 25-1073). "[P]rison officials may not 'deny reasonable requests for medical treatment . . . when such denial exposes the inmate to undue suffering or the threat of tangible residual injury.'" *Durham v. Kelley*, 82 F.4th 217, 230 (3d Cir. 2023) (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017)); *see also Montanez*, 154 F.4th at 141 ("[The deliberate indifference] standard can also be met by a defendant abandoning a prisoner in a condition that unreasonably exposes him to the threat of tangible residual injury." (internal quotation marks and citation omitted)).

---

specific-provision rule forecloses Betts's substantive due process claims." (footnote omitted)). In other words, there is no legal basis for a due process claim here.

7

"Not every complaint of inadequate prison medical care rises to the level of deliberate indifference." *Anderson v. Price*, No. 22-3058, 2023 WL 5814664, at *2 (3d Cir. Sept. 8, 2023) (*per curiam*). "Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic*, 854 F.3d at 227 (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* at 228 (cleaned up). "Nonetheless, there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier and less efficacious treatment' of the inmate's condition." *Id.* (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)). Deliberate indifference includes "situations where 'necessary medical treatment is delayed for non-medical reasons.'" *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). It "is also evident where prison officials erect arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care to suffering inmates," or "when prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment." *Monmouth Cnty.*, 834 F.2d at 346-47 (cleaned up).

### A.    Commonwealth Defendants

Although his Complaint is not entirely clear as to whether he intended to name both individual Defendants and the entities those individuals work for, the Court understands Mr.

Douglas to have named the DOC, the SCI-Phoenix Medical Department, and the Department of General Services, as well as Defendants Huner, Savage, and Harry in their individual and official capacities (collectively, the "Commonwealth Defendants").[4]  DI 1 at 2-4.  The Eleventh Amendment bars suits against a state and its agencies in federal court that seek monetary damages.  *See Pennhurst State Sch. And Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984); *A.W. v. Jersey City Public Schs.*, 341 F.3d 234, 238 (3d Cir. 2003).  Suits against state officials acting in their official capacities are really suits against the employing government agency, and as such, are also barred by the Eleventh Amendment.  *See A.W.*, 341 F.3d at 238; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989). Additionally, where a claim is filed against state officials who were not directly involved in the activities that caused the alleged constitutional violation, but are instead named as defendants because of their positions in state government, they are deemed to be sued in their official capacities and thus entitled to Eleventh Amendment immunity.  *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020).  As the Commonwealth has not waived its Eleventh Amendment immunity for lawsuits filed in federal court, *see* 42 Pa. Cons. Stat. § 8521-22, it and its departments, as well as their officials sued in their official capacities, are immune from suits filed in federal court.

---

[4]  As explained in the Court's service Order, the anonymous Defendants that Mr. Douglas named could not be served until he provided more identifying information.  DI 8 at 1-2 n.1.  He has not done so and, his Complaint does not specifically describe the involvement of any Doe Defendant in his medical treatment.  But we will grant Mr. Douglas's request for additional time to amend and correct this deficiency.  DI 1 at 4, 13.  If he chooses to file an amended complaint, he must plead the identities of the Doe Defendants with as much specificity and distinction as possible, such as "John Doe Nurse #1," or "Jane Doe Doctor #2," combined with corresponding facts like the date, time, and place that he interacted with each of those individuals, and must provide specific details of how they were involved in his claims, such as supplying him with forms to sign or discussing the scheduling of his outside treatment.

9

However, state officials sued in their individual capacities are "persons" within the meaning of Section 1983. *See Hafer*, 502 U.S. at 31. Thus, the Eleventh Amendment does not bar suits for monetary damages brought under Section 1983 against state officials in their individual capacities. *Id.* The Eleventh Amendment also does not generally bar prospective declaratory or injunctive relief. *See Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (explaining that "official-capacity actions for prospective relief are not treated as actions against the State"); *see also Edelman v. Jordan*, 415 U.S. 651, 677 (1974) (holding that "a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief."); *O'Callaghan v. Hon. X*, 661 F. App'x 179, 182 (3d Cir. 2016). Accordingly, the Court will dismiss the claims against the DOC, the SCI-Phoenix Medical Department, and the Department of General Services,[5] and will consider only claims against Huner, Savage, and Harry for damages in their individual capacities and for injunctive relief.

As the Commonwealth Defendants argue, Mr. Douglas does not adequately allege that they were personally involved in the decision not to send him for his scheduled surgery in April 2024 or in the failure to reschedule his surgery. DI 28 at 7-8. He alleges only that "Wellpath and Commonwealth Defendants" summoned him to the infirmary and told him that he had to spend the night there. Mr. Douglas does not name or describe any individual responsible for that decision; he merely states that he objected to the housing arrangement and was told his surgery

---

[5] The Prison Litigation Reform Act requires the Court, whether on its own or pursuant to a motion, to "dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1997e(c)(1); *see Beenick v. LeFebvre*, 684 F. App'x 200, 204 (3d Cir. 2017) (explaining that "§ 1997e(c) is applicable throughout the litigation and provided the District Court with the authority to review the claim, regardless of the stage of the case" (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109, n.11 (3d Cir. 2002)).

10

would be rescheduled.  He does not plead any facts suggesting that he sought to have the surgery rescheduled until six months later, when he filed a request with Defendants Huner and Savage, and that he filed a grievance when they did not respond within five days.  In appealing the denial of that grievance, Mr. Douglas stated that he had not signed a form refusing treatment, or if he had signed such a form, he was coerced into doing so.  But he pleads no facts about signing or being asked to sign the form — he merely pleads the position that he took during the grievance process.  And, while he provides full details of how he exhausted his grievance, he does not plead that he ever returned to the medical department to ask for his treatment to be rescheduled or that he had any other contact with Huner, Savage, or Harry concerning his treatment.[6] Somewhat confusingly, he alleges that Huner and Savage did not respond to his October 14, 2024 request for rescheduling, but he also pleads that Huner and Savage "advised [him that] the urological surgical procedure scheduled for [April 14, 2024,] would be rescheduled."  (Compl. at 8, 14, 16.)  Yet he does not allege when, if ever, he had other communications with Huner and Savage regarding his medical care and what transpired during any such conversations. Accordingly, he has not alleged the personal involvement of Huner and Savage in his claims.[7]

---

[6]  As the Commonwealth Defendants note, Mr. Douglas "never addresses" the direction from the response to his grievance that he should "meet with a provider at sick call to discuss" rescheduling his treatment.  DI 28 at 8 (quoting DI 1 at 9).

[7]  The Commonwealth Defendants also argue that, even assuming Mr. Douglas had alleged their personal involvement in requiring him to be housed in the infirmary overnight with other inmates, "it would be objectively reasonable to assume that extra time (plus staffing including security) for the off-site transport was needed and that having Plaintiff sleep in the infirmary the night before the surgery would have sped up this process."  DI 28 at 7.  The Court declines to dismiss Mr. Douglas's claim on this basis, because Mr. Douglas also pleads that he had made three prior trips to the urologist and he had been retrieved directly from his own cell in those instances, and that the infirmary had single cells to accommodate Z-coded inmates.  DI 1 at 6, 8. Taking his allegations as true, the Court could draw a reasonable inference that requiring him to be housed overnight in the infirmary with three other inmates before this fourth trip to the urologist because it would have "sped up the process" of transporting him delayed his medical

11

As to Defendant Harry, the lone mention of her in his facts is to allege in conclusory fashion that his "urological problem remains untreated by . . . the DOC/Laurel Harry," along with every other named Defendant. (Compl. at 13.)  As Harry argues, it appears that Mr. Douglas named her as a Defendant solely on the basis of her position as the Secretary of the DOC, and not because of her personal involvement in his claims, and he does not state a plausible claim for supervisory liability against her.  DI 28 at 8-11.  Generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation.  *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.'  However, a director cannot be held liable 'simply because of his position as the head of the [agency].'") (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)).  Also, liability under § 1983 cannot be predicated on a *respondeat superior* basis.  *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 2015); *Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at *2 (3d. Cir. Nov. 28, 2022) (*per curiam*).

---

treatment for a non-medical reason and constituted an "arbitrary and burdensome" procedure that prevented him from receiving treatment for which he had already been recommended, *see Monmouth Cnty.*, 834 F.2d at 346-47, or that it exhibited deliberate indifference to a substantial risk of serious harm to his safety, *see Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2022) (explaining that, to plead a conditions-of-confinement claim, a plaintiff must allege facts to support an objective component that "the deprivation he endured was 'sufficiently serious,'" and a subjective component that "the prison officials had 'a sufficiently culpable state of mind'" (quoting *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020)); *see also Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991) (a prisoner must plausibly allege that prison officials acted with deliberate indifference, meaning that they consciously disregarded a serious risk to health or safety). However, because he has not identified the person or persons who required him to sleep in the infirmary in order to receive his treatment or described such persons or the circumstances around the imposition of that requirement with sufficient facts, he has not stated a claim to relief.

12

Rather, "[s]uits against high-level government officials must satisfy the general requirements for supervisory liability." *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017). There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Chavarriaga*, 806 F.3d at 227. Mr. Douglas does not plead facts to support either theory of supervisory liability against Defendant Harry, so his claims against her will be dismissed.

### B.    Wellpath and Dr. Letizio

Mr. Douglas names Wellpath, Dr. Letizio, and the unknown "Off-Site" Medical Director for Wellpath at the DOC Central Office as Defendants. First, he does not state the personal involvement of Letizio or the Off-Site Medical Director in his claims, and appears to name these Defendants because of their supposed supervisory positions. As with Secretary Harry, discussed above, liability in a § 1983 action cannot be based on *respondeat superior*, and simply pleading that someone was in charge of another wrongdoer is not enough to state their personal involvement. *See Chavarriaga*, 806 F.3d at 227; *Saisi*, 822 F. App'x at 48. So, any claims

against Dr. Letizio and the unnamed Off-Site Medical Director will be dismissed for lack of personal involvement.

As for Wellpath itself, a private corporation under contract to provide medical services at a jail or prison may be liable under § 1983 in certain circumstances.  The United States Court of Appeals for the Third Circuit has held that "a private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.'"  *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (quoting *Natale*, 318 F.3d at 583 (applying the municipal-liability framework of *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), to claims against medical contractor)).  To hold a private health care company like Wellpath liable for a constitutional violation under § 1983, a plaintiff must allege Wellpath had "a relevant . . . policy or custom, and that the policy caused the constitutional violation [he] allege[s]." *Natale*, 318 F.3d at 583-84 (citing *Brown*, 520 U.S. at 404); *see also Menkins v. Dep't of Corrs.*, No. 24-5258, 2025 WL 2778096, at *4 (E.D. Pa. Sept. 26, 2025) ("Because [defendant] is a private company contracted by a prison to provide health care for inmates, . . . it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs." (quoting *Lomax v. City of Philadelphia*, No. 13-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017)).  A plaintiff asserting such a claim "must identify [the] custom or policy, and specify what exactly that custom or policy was" to satisfy the pleading standard.  *McTernan v. City of York,* 564 F.3d 636, 658 (3d Cir. 2009).  "A plaintiff must also allege that the policy or custom was the 'proximate cause' of his injuries."  *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).  This can be done "by

demonstrating an 'affirmative link' between the policy or custom and the particular constitutional violation" alleged. *Id.* (citation omitted).

Mr. Douglas states that "Wellpath" required him to stay overnight in the infirmary and did not respect his Z-Code status. (Compl. at 8.) However, he does not plead that this was the result of a Wellpath policy; indeed, as discussed above, he asserts that he had been transported directly from his cell on the three prior visits to the urologist, and that the relevant DOC Z-Code policy would have allowed him to remain in his own cell or be housed in a single room or cell in the infirmary. (*See* Compl. at 6, 8.) Because he cannot simply attribute his harms to "Wellpath" because of acts by unidentified Wellpath employees, and he does not plead that he was harmed by Wellpath's policies, he has not stated a claim to relief.

Moreover, Wellpath was discharged from liability by the United States Bankruptcy Court for the Southern District of Texas, Houston Division, for claims seeking money damages that arose prior to November 11, 2024. *See In Re Wellpath Holdings, Inc.*, No. 24-90533 (Bankr. S.D. Tx.), ECF Nos. 2596 ("The Plan"), 2679, 2680; *see also* 11 U.S.C. § 524(a)(2) ("A discharge in a [Chapter 11 bankruptcy] case . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived."). As Letizio argues, Wellpath's approved Plan also includes a "Third-Party Release" relating to claims against current and former employees of Wellpath. DI 12 at 4. Article IX of the Plan required plaintiffs holding claims that arose prior to November 11, 2024, to "opt out" of the Third-Party Release if they wish to preserve their claims against Wellpath employees. DI 12-2 at 13, 52, 81-82, 85, 127-136 (reproducing relevant portions of the Plan and the confirmation order)). Article IX.F of the Plan provides that holders of claims subject to the

15

Third-Party Release who did not opt out are permanently enjoined from "commencing or continuing any action or proceeding of any kind on account of or in connection with or with respect of" any released claims. *Id.* at 134. Under the Plan, any holder of a claim arising prior to November 11, 2024, who is or was an incarcerated individual had until July 30, 2025, to opt-out of the Third-Party Release.

The Court noted the existence of Wellpath's bankruptcy, the confirmed Plan, and the Third-Party Release in an Order dated August 14, 2025. DI 4 at 1-2 n.2. Specifically, the Court stated that it was unclear whether Mr. Douglas had timely submitted a proof of claim or taken any action that could be construed as opting out of the Third-Party Release. *Id.* Wellpath and Letizio move for dismissal of the claims against them based on the discharge in bankruptcy and the Third-Party Release. *See generally*, DI 12. In response, Mr. Douglas has not asserted that he opted out of the Third-Party Release, and the Court has found no indication on the bankruptcy docket that he has. Instead, he has argued both in this Court and in his lone submission to the bankruptcy court that because the bankruptcy proceedings occurred in Texas, they should have no application to his claims in Pennsylvania; indeed, he has expressly argued that he is "not a creditor" in the bankruptcy proceedings. DI 29 at 6-9; DI 32 at 2-3; DI 35 at 1-2; *see also In re Wellpath*, Bankr. S.D. Tx. No. 24-90566, at Dkt. No. 1635 (cross-filing DI 35 from this action)). As Wellpath and Letizio argue, he is mistaken. DI 31 at 1. To the contrary, bankruptcy courts have "comprehensive jurisdiction" over any proceedings that "could conceivably have any effect on the estate being administered in bankruptcy" so they can "deal efficiently and expeditiously with matters connected with the bankruptcy estate." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 163-64 (3d Cir. 2004) (internal quotation marks omitted). "At the conclusion of a bankruptcy proceeding, a bankruptcy court typically enters an order releasing the debtor from liability for

16

most prebankruptcy debts.  This order, known as a discharge order, bars creditors from attempting to collect *any* debt covered by the order." *Taggart v. Lorenzen*, 587 U.S. 554, 556 (2019) (emphasis added) (citing 11 U.S.C. § 524(a)(2)).

Accordingly, consistent with the terms of the Plan and the Third-Party Release, any claims against Wellpath and its employees for money damages arising before November 11, 2024, are dismissed without prejudice to Mr. Douglas pursuing any remedies available to him in the bankruptcy proceedings.  The Court expresses no opinion on the availability of such remedies, the validity of the Third-Party Release, or the adequacy of notice and consent, which are issues best directed to the Bankruptcy Court and District Court for the Southern District of Texas.  *See, e.g.*, *Jackson v. Smith*, No. 23-0272, 2026 WL 1308870, at *2 (W.D. Pa. Apr. 16, 2026), *report and recommendation adopted sub nom. Jackson v. Wellpath*, 2026 WL 1303028 (W.D. Pa. May 12, 2026); *see also Davis v. St. Amour*, No. 23-00593 2026 WL 820668, at *3 (W.D. Va. Mar. 25, 2026) (citing, *inter alia*, *Patterson v. Mahwah Bergen Retail Grp.*, 636 B.R. 641 (E.D. Va. 2022)); *cf. In re Smallhold, Inc.*, 665 B.R. 704, 717-26 (Bankr. D. Del. 2024) (discussing the consent requirement for third-party releases in the wake of *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024)).  However, Mr. Douglas may include in his amended complaint any claims against Wellpath and any of its employees that arose after November 11, 2024, or seek injunctive relief, if he is able to plead more facts to cure the defects identified above regarding policies and personal involvement.

## IV.   CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss will be granted.  Mr. Douglas's Complaint will be dismissed without prejudice, and he may file an amended complaint.  An order follows, which provides more information about amendment.